## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

JULIAN GRIFFIN,

    *Plaintiff,*

    *v.*

CLARITY SERVICES, INC.,

    *Defendant.*

Case No:_____

**JURY TRIAL DEMANDED**

## COMPLAINT AND JURY TRIAL DEMAND

COMES NOW the Plaintiff, Julian Griffin ("Mr. Griffin"), by and through his attorneys, Seraph Legal, P.A., and complains of the Defendant, Clarity Services, Inc. ("Clarity" or "Defendant"), stating as follows:

## PRELIMINARY STATEMENT

1. This is an action for damages brought by Mr. Griffin against the Defendant for violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq. ("FCRA").

## JURISDICTION AND VENUE

2. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which provides that an action to enforce any liability created under the FCRA may be brought in any appropriate United States district court without regard to the amount in controversy.

3.    This Court has personal jurisdiction over the Defendant because the Defendant regularly conducts business in the State of Florida and within this District, and because the acts giving rise to this action occurred within this District.

4.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Mr. Griffin's claims occurred in this District, where Mr. Griffin resides and received his consumer report disclosures at issue.

## PARTIES

### Mr. Griffin

5.    Mr. Griffin is a natural person residing in Tallahassee, Leon County, Florida.

6.    Mr. Griffin is a Consumer as defined by the FCRA, 15 U.S.C. § 1681a(c).

### Clarity

7.    Clarity is a Delaware corporation, with a principal business address at 475 Anton Boulevard, Costa Mesa, CA 92626.

8.    Clarity is registered to conduct business in the State of Florida, where its Registered Agent is CT Corporation System, 1200 South Pine Island Rd., Plantation, FL 33324.

9.    Clarity is a Consumer Reporting Agency ("CRA") within the meaning

of the FCRA, 15 U.S.C. § 1681a(f), in that it, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and uses various means of interstate commerce for the purpose of preparing or furnishing consumer reports, specifically including mail and telephone communications.

## FACTUAL ALLEGATIONS

### Clarity's Inaccurate Consumer Reports Regarding Mr. Griffin

10.    Around August 12, 2019, Clarity began maintaining a credit file on Mr. Griffin.

11.    Clarity, a CRA that predominantly serves the needs of online lenders making short-term loans, programs its systems to acquire and report as much information as possible, with little regard to the quality or accuracy of the data.

12.    On or about July 14, 2026, Mr. Griffin requested and obtained a copy of his consumer disclosure from Clarity.

13.    Mr. Griffin's review of the disclosure revealed that Clarity was reporting inaccurate, contradictory, and misleading information, as detailed below.

### Clarity Reports the Same Loan Twice

14.    Mr. Griffin's disclosure revealed Clarity is reporting the same loan twice in Mr. Griffin's file.

15.    The disclosure contains a NetCredit loan (account ending 1944, opened

on August 12, 2019, in the original amount of $10,000) as two separate tradelines: Account #1, under the furnisher name "NetCredit," and Account #2, also under the furnisher name "NetCredit."



16.    The two tradelines are clearly and obviously the same loan: each displays the same account number ("XXXXXXXXXXXX1944"), the same open date (August 12, 2019), the same original amount ($10,000), and the same number of payments (61, biweekly only).

17.    Mr. Griffin took out this loan exactly once.

18.    Both tradelines carry a derogatory status.

19.    A single alleged default is therefore counted against Mr. Griffin twice:

Page **4** of **37**

any lender reviewing the file sees two defaulted accounts where, at most, one exists.

20. The two entries also contradict each other.

21. One reports a current balance of $10,962; the other reports a current balance of $0. Both figures describe the same loan, so on their face, at least one of them is false.

22. Nonetheless, Clarity published both.

23. Clarity did not need to conduct any investigation to discover the duplication.

24. Every datum needed to recognize the two entries as one loan – the account number, the open date, the amount, the payment schedule, and the identity of the furnisher that supplied each entry – was in Clarity's possession when it assembled the file.

25. Clarity assigns each of its data furnishers a subscriber identity and knows which furnisher supplied each tradeline; Clarity accordingly knew that both entries originated from the same lending relationship.

26. No procedure reasonably designed to assure maximum possible accuracy would permit a consumer reporting agency to publish the same loan twice under two variants of the same furnisher's name.

27. Mr. Griffin's disclosure revealed Clarity is reporting the same loan twice in Mr. Griffin's file.

28.     The disclosure contains a Credit Ninja loan (account ending 0204, opened on May 6, 2023, in the original amount of $2,100) as two separate tradelines: Account #13, under the furnisher name "Credit Ninja/First Electronic Bank," and Account #14, under the furnisher name "Credit Ninja."



29.     The two tradelines are clearly and obviously the same loan: each displays the same account number ("XXX0204"), the same open date (May 6, 2023), the same original amount ($2,100), and the same number of payments (39, biweekly only).

30.     Mr. Griffin took out this loan exactly once.

31.     Both tradelines carry a status of "Charge-Off."

32.     A single alleged default is therefore counted against Mr. Griffin twice: any lender reviewing the file sees two defaulted accounts where, at most, one exists.

33.     The two entries also contradict each other.

34.     One reports a current balance of $0; the other reports a current balance of $4,563. Both figures describe the same loan, so on their face, at least one of them is false.

35.     Nonetheless, Clarity published both.

36.     Clarity's own file records that the loan was sold: the Account #13 entry carries the furnisher comment "Purchased by another company."

37.     This comment appears when the lender has sold the account to an unrelated third-party debt purchaser.

38.     As such, neither Credit Ninja tradeline reflects the account's true balance of $0 owed to Credit Ninja and/or First Electronic Bank.

39.     Account #14 nonetheless reports a current balance of $4,563 due and owing on the Credit Ninja loan.

40.     No balance is owed to a lender that has sold the account, and Clarity is thus reporting a balance that is not owed to Credit Ninja at all.

41.     Further, Credit Ninja loans require biweekly payments; the second Credit Ninja account has not been updated since June 19, 2024.

42. Procedures which call for the inclusion of account data which is more than two years since its balance was last updated virtually guarantee Clarity would be selling stale, inaccurate data.

43. Clarity did not need to conduct any investigation to discover the duplication.

44. Every datum needed to recognize the two entries as one loan – the account number, the open date, the amount, the payment schedule, and the identity of the furnisher that supplied each entry – was in Clarity's possession when it assembled the file.

45. Clarity assigns each of its data furnishers a subscriber identity and knows which furnisher supplied each tradeline; Clarity accordingly knew that both entries originated from the same lending relationship.

46. No procedure reasonably designed to assure maximum possible accuracy would permit a consumer reporting agency to publish the same loan twice under two variants of the same furnisher's name.

47. Clarity sells its reports to short-term and subprime lenders that scrutinize precisely this kind of file. A duplicated derogatory tradeline overstates the number of accounts Mr. Griffin has defaulted on and understates his creditworthiness, to his direct detriment each time Clarity sells a report about him.

48. Clarity's credit file on Mr. Griffin contains four separate driver's license

entries – which is itself impossible, as Florida law permits a person to hold only one driver's license at a time.

49. Mr. Griffin holds exactly one Florida driver's license. The last four characters of his actual driver's license number are "7000." Any driver's license entry in Clarity's file whose visible characters or length conflict with that license is not Mr. Griffin's driver's license number.

50. The entry "XXXXX4554" is false. Clarity discloses the entry only in redacted form, but the redaction leaves the final characters visible – "4554" – and they conflict with the final characters of Mr. Griffin's actual license number, "7000." Whatever characters the redaction conceals, the visible characters alone establish that this entry is not, and cannot be, Mr. Griffin's driver's license number.

51. The entry is also nine characters long, where a Florida driver's license number is exactly 13 – an independent ground of falsity.

52. The entry "XXXXXXXX9181" is false. Clarity discloses the entry only in redacted form, but the redaction leaves the final characters visible – "9181" – and they conflict with the final characters of Mr. Griffin's actual license number, "7000." Whatever characters the redaction conceals, the visible characters alone establish that this entry is not, and cannot be, Mr. Griffin's driver's license number.

53. The entry is also 12 characters long, where a Florida driver's license number is exactly 13 – an independent ground of falsity.

54. The entry "XXXXXXXXX1810" is false. Clarity discloses the entry only in redacted form, but the redaction leaves the final characters visible – "1810" – and they conflict with the final characters of Mr. Griffin's actual license number, "7000." Whatever characters the redaction conceals, the visible characters alone establish that this entry is not, and cannot be, Mr. Griffin's driver's license number.

55. These determinations require no inference: with Mr. Griffin's actual license number in hand, the falsity of each entry above is apparent from the face of Clarity's own disclosure. Clarity is reporting, and selling, driver's license numbers for Mr. Griffin that are false.

56. Reasonable procedures designed to assure maximum possible accuracy of consumer reports would not report multiple conflicting license numbers for one consumer, and would have flagged and rejected the false entries rather than incorporating and selling them.

57. Compounding the harm, lenders rely on driver's license data to confirm a consumer's identity; the presence of false license data in Mr. Griffin's file creates the false impression that his identity cannot be confirmed, directly damaging his creditworthiness.

58. Clarity's consumer disclosure to Mr. Griffin dated July 14, 2026 reports the account numbers on 21 of his tradelines, each in redacted form, showing only the final few digits of each. The redacted tradelines are those of the following

furnishers:

- NetCredit

- Personify

- Credit Cube/Infinity (five loans)

- TCDS/MobiLoans

- Uprova Credit/Habemco/ULPS (two loans)

- Credit Ninja/First Electronic Bank

- Credit Ninja

- Buffalo Lake Lending

- BlueChip dba Spotloan

- CCFLOW/TLS/AF247

- Today Cash (three loans)

- Napa Lending/Infinity/Insight (two loans)

- Advance.Cash/LeadEnvy/Infinity

59.   The FCRA requires a consumer reporting agency, upon a consumer's request, to "clearly and accurately disclose to the consumer … [a]ll information in the consumer's file at the time of the request." 15 U.S.C. § 1681g(a)(1).

60.   The statute permits a CRA to truncate a consumer's Social Security number in the disclosure *only* on the consumer's request, 15 U.S.C. § 1681g(a)(1)(A), and separately governs the truncation of credit and debit card

numbers on electronically printed receipts, 15 U.S.C. § 1681c(g).

61.     Nothing in the FCRA authorizes a consumer reporting agency to redact a tradeline account number in a consumer's file disclosure.

62.     Because Clarity has masked the account number, Mr. Griffin cannot determine from the disclosure whether the account Clarity reports is in fact his account, whether the balance, status, and payment history Clarity attributes to that number are accurate, or whether the tradeline belongs to a different consumer altogether. The redaction does not aid the accuracy of the disclosure – it forecloses his ability to verify the underlying data at all.

63.     Clarity's decision to disclose the account only in redacted form is itself the violation: Clarity did not "clearly and accurately disclose" the contents of his file as 15 U.S.C. § 1681g(a)(1) requires.

64.     A review of Mr. Griffin's Clarity credit file reveals that Clarity failed to implement even the most basic address-standardization or validation procedures. Specifically, Mr. Griffin's credit file contains an entry where Mr. Griffin's home address is reported as "POETS TALLAHASSEE FL 32311" – a record that contains a street name, city, state and ZIP code but is missing both the street number and the street type entirely.

65.     No mail carrier could deliver to such an address, no postal database would validate it, and no consumer in fact resides there.

66.    These are not ambiguous errors. They are facially impossible address formats that any reasonable data-quality check would have flagged and rejected.

67.    By failing to utilize any of the numerous existing address validation tools to scrub these obvious errors, Clarity incorporated data into Mr. Griffin's credit file which is misleading, inaccurate, and prejudicial to Mr. Griffin's creditworthiness.

68.    Clarity's credit scoring system specifically looks at the number of changes to a consumer's residential history; the more frequently a consumer has new address information reported – even if the address is the same but with a small variation – the worse a consumer will score. By reporting the same address in multiple malformed formats, Clarity artificially inflates the apparent frequency of residential changes, further harming the consumer's risk score.

69.    Clarity incorporated data reporting that during various overlapping timeframes, Mr. Griffin's housing status was "OTHER," "OWN," "RENT" and "X," all within the same credit file.

70.    For example, Clarity reported Mr. Griffin's housing status as "OTHER" from December 10, 2022 through July 13, 2024; and "OWN" from September 30, 2021 through May 10, 2026; and "RENT" from August 5, 2021 through May 18, 2026; and "X" from August 22, 2023 through September 30, 2023.

71.    The multiple and contradictory housing statuses Clarity reported for

Mr. Griffin cannot all be simultaneously accurate. The designation "OTHER" is a catch-all category not defined anywhere in Clarity's consumer disclosure, providing no meaningful information to a lender. More importantly, it is false – Mr. Griffin was not living in an "OTHER" housing situation at any point relevant to Clarity's reporting.

72.    Many subprime lenders – the type Clarity services almost exclusively – use housing status to gauge risk, and treat an "OTHER" housing status as less stable than "OWN" or "RENT." That treatment leads to less favorable lending terms, or outright denials of credit, for Mr. Griffin.

73.    Among the housing-status values Clarity incorporated into Mr. Griffin's consumer file is the bare letter "X" – a value that, on its face, is not a housing status at all. Clarity reported Mr. Griffin's housing status as "X" from August 22, 2023 through September 30, 2023 on at least two separate occasions, and disclosed that value to third parties as if it were a substantive description of his living situation.

74.    The letter "X" has no meaning as a housing status. It does not describe how Mr. Griffin lives, where he lives, or any other attribute of his residence.

75.    The most plausible explanation for the appearance of "X" in Clarity's Housing Status field is that some upstream intake form contained a check-the-box widget (e.g., "[ ] Own  [ ] Rent  [ ] Other") into which a furnisher or consumer placed a check mark – a literal "x" – and Clarity's ingestion path captured the check mark

itself as if it were the field value.

76.    A consumer reporting agency following reasonable procedures within the meaning of 15 U.S.C. § 1681e(b) would recognize that "X" is not a housing status and would either reject the submission, route it to manual review, or, at minimum, decline to display it to downstream subscribers as if it were a real value. Clarity did none of those things.

77.    The presence of "X" in Mr. Griffin's Housing Status field is not an isolated typographical anomaly. It is evidence that Clarity has no field-level validation on the Housing Status field at all – no code list, no enumerated values, no length check, no schema enforcement that would prevent a single-character non-value from being ingested, stored, and resold.

78.    Clarity accepts whatever bytes its furnishers send, displays them verbatim, and sells the resulting file as a "consumer report" under the FCRA. That is the opposite of "reasonable procedures to assure maximum possible accuracy" that the statute requires.

79.    Consequently, Clarity's inclusion of inaccurate and conflicting housing status data had a significant negative impact on Mr. Griffin's ability to obtain new credit.

80.    Clarity frequently misreported Mr. Griffin's length of residential history, often contradicting itself in its own reporting, as the following examples

illustrate.

81.    For example, on December 5, 2021 at 7:50:47 AM, Clarity incorporated data reporting Mr. Griffin resided at his address for 5 Months. Just 21 seconds later at 7:51:08 AM, Clarity incorporated data reporting Mr. Griffin had resided at his address for 77 Months. Thus, Clarity's report indicates Mr. Griffin gained 6 years of residential history in just 21 seconds, which is impossible.

82.    Similarly, on January 1, 2022 at 6:22:33 PM, Clarity incorporated data reporting Mr. Griffin resided at his address for 11 Months. Just 2 minutes later at 6:24:53 PM, Clarity incorporated data reporting Mr. Griffin had resided at his address for 35 Months. Thus, Clarity's report indicates Mr. Griffin gained 2 years of residential history in just 2 minutes, which is impossible.

83.    The overlapping and contradictory residential timelines Clarity reported – including Clarity's repeated reports that Mr. Griffin had resided at his current address for "0 Months" – create a facially inaccurate and frankly nonsensical residential history that violates the mandate of 15 U.S.C. § 1681e(b) and creates the negative and false impression that Mr. Griffin has recently moved, has been unhoused, moves residences frequently, or resides at multiple residences simultaneously.

84.    Clarity's employment data also contains substantial distortions about Mr. Griffin's employment history. Clarity's file contains 37 different "Months at

Employer" values for Mr. Griffin, including: 0 Months, nine Months, 17 Months, 30 Months, 60 Months and 128 Months. It is not logically consistent for an employee to simultaneously have these contradictory employment tenures.

85.    The same defect infects Clarity's employment-tenure reporting. On December 5, 2021 at 7:50:47 AM, Clarity reported Mr. Griffin had been with his employer for 1 Months. Just 21 seconds later at 7:51:08 AM, Clarity reported Mr. Griffin had been with his employer for 73 Months. It is impossible for a consumer to gain 6 years of employment history in 21 seconds on a single day.

86.    The multiple timeline impossibilities Clarity incorporated into Mr. Griffin's credit file with respect to his employment tenure – including Clarity's repeated reports that Mr. Griffin had been with his employer for "0 Months" – are not only patently absurd given their chronological impossibilities, but they also create a misleading and unreliable record of Mr. Griffin's employment stability and the damaging impression that Mr. Griffin was either repeatedly unemployed or had a tendency to abruptly switch occupations.

87.    Clarity's failure to maintain reasonable data-filtering procedures is further evidenced by its inclusion of multiple fragmented, duplicate, and near-identical variations of the exact same employer name. Within the Employer Name section of Mr. Griffin's report, Clarity incorporated the following variants as if each represented a distinct employer: "Q SERVICES" and "QSERVICES."

88.    These near-identical spellings refer to a single employer; reporting them as separate entities creates a highly misleading narrative that Mr. Griffin concurrently worked for, or moved between, multiple distinct companies. A reasonable data-quality procedure would have reconciled these obvious variants of a single employer name into a consistent record.

89.    Clarity's reporting further demonstrates a basic failure to confirm that data is being placed in the correct section of his credit file. The value "I2X SOLUTIONS," "MEDIACOM COMMUNICATI," "METRONET BUSINESS," "METRONET FIBER," "PAVLOV MEDIA," and "QA" each appear in Mr. Griffin's file as both an Employer Name and an Occupation.

90.    An employer is a business; an occupation is a job function the consumer performs. These are categorically distinct types of information, and Clarity's own disclosure separates them into distinct sections.

91.    The appearance of the same value in both fields is the signature of an intake process that accepts whatever data furnishers transmit without confirming the data is even being placed in the correct field. A reasonable procedure to assure maximum possible accuracy would, at minimum, refuse to populate the Occupation field with values that are obviously company names.

92.    Clarity also incorporated "123 MAIN STREET TALLAHASSEE FL" as a valid Employer Address in Mr. Griffin's credit file. This is a prime example of

Clarity's use of dummy, placeholder information in a consumer's credit file when a data furnisher fails to input correct data or fails to provide properly formatted data.

93.    Notably, none of these addresses includes any ZIP code, an obvious red flag that no real-world address validation could have permitted.

94.    Despite information like this being made-up, dummy, placeholder data, Clarity does not disclose this to consumers or to creditors when it sells the data.

95.    Clarity's systems are literally programmed to insert false information into consumer credit files in many instances, such as the above, despite the FCRA's mandate to utilize procedures designed to ensure maximum possible accuracy of information.

96.    Clarity also incorporated reporting that Mr. Griffin's occupation was "QA," which is clearly not an occupation.

97.    Clarity's reporting of Mr. Griffin's "Net Monthly Income" contains variations so extreme and statistically improbable that, on their face, the data is virtually assured to be false in substantial part. Reasonable procedures designed to assure maximum possible accuracy of consumer reports would have flagged these figures as facially unreliable rather than incorporating and selling them.

98.    Clarity's file contains 46 different income figures for Mr. Griffin, ranging from $0 to $26,000 per month, including: $0, $5,400, $6,300, $8,000, $10,973, and $26,000. These figures span a range of $26,000 per month – a variation

so vast that it is statistically impossible for all of them to accurately reflect Mr. Griffin's actual income.

99. On September 30, 2022 alone, Clarity simultaneously reported Mr. Griffin's Net Monthly Income as both $1,000 and $2,000. A person can only have one income at any given moment; reporting materially different income figures for the exact same date is, on its face, so atypical and internally contradictory that the data is virtually assured to be false.

100. No reasonable procedure designed to assure maximum possible accuracy of consumer reports could have permitted these mutually exclusive figures to be reported as if both were accurate.

101. Similarly, on September 25, 2023, Clarity simultaneously reported Mr. Griffin's Net Monthly Income as both $1,900 and $2,500 – another set of mutually exclusive figures Clarity reported for a single date.

102. Again, on October 4, 2024, Clarity simultaneously reported Mr. Griffin's Net Monthly Income as both $5,600 and $9,214 – another set of mutually exclusive figures Clarity reported for a single date.

103. Likewise, on September 24, 2024, Clarity simultaneously reported three different Net Monthly Income figures for Mr. Griffin: $6,776, $6,800 and $8,800 – another set of mutually exclusive figures Clarity reported for a single date.

104. And again, on March 2, 2023, Clarity simultaneously reported Mr.

Griffin's Net Monthly Income as both $7,750 and $17,000 – another set of mutually exclusive figures Clarity reported for a single date.

105. Still again, on January 1, 2022, Clarity simultaneously reported Mr. Griffin's Net Monthly Income as both $10,400 and $26,000 – another set of mutually exclusive figures Clarity reported for a single date.

106. Similarly, on December 7, 2022, Clarity simultaneously reported Mr. Griffin's Net Monthly Income as both $10,432 and $13,000 – another set of mutually exclusive figures Clarity reported for a single date.

107. Among the income figures Clarity reported was $0.00 – directly contradicted by Clarity's own simultaneous reporting that Mr. Griffin is actively employed. A consumer cannot maintain employment while simultaneously earning $0 in income.

108. Income is a critical metric used by financial institutions to calculate debt-to-income ratios and evaluate creditworthiness. By reporting wildly inconsistent and internally contradictory income figures for Mr. Griffin, Clarity's file creates a false and misleading picture of Mr. Griffin's financial situation, significantly increasing the likelihood of credit denials, reduced credit limits, or extension of credit on much less favorable, higher-interest terms.

109. Clarity's reporting of Mr. Griffin's pay frequency is internally inconsistent. Clarity's file lists five different pay frequencies for Mr. Griffin – "BI

WEEKLY," "BIWEEKLY," "MONTHLY," "SEMIMONTHLY" and "WEEKLY" – even though a consumer is paid on only one schedule at any given time.

110. These pay schedules are mutually exclusive. A person paid weekly is not also paid monthly, and a person paid biweekly (every two weeks) is not also paid semimonthly (twice per month on fixed dates). Clarity's incorporation of contradictory pay-frequency data reflects an absence of data-quality controls and a failure to implement reasonable procedures to assure maximum possible accuracy of its consumer reports.

111. Clarity's file additionally lists facially absurd pay-frequency values for Mr. Griffin: "OW" – which is not a recognized payroll designation. Clarity's credit file does not include a legend defining what "OW" pay status means; and "S" – which is not a recognized payroll designation. Clarity's credit file does not include a legend defining what "S" pay status means.

112. These entries do not correspond to any actual pay schedule and could not have survived any reasonable procedure designed to assure maximum possible accuracy of consumer reports.

113. Clarity's phone data is internally inconsistent in further impossible ways. The numbers "229-XXX-7939" and "850-XXX-0504" each appear simultaneously in Mr. Griffin's Clarity file as his cell phone, his home phone, AND his work phone – an impossibility for any normal consumer, whose work phone is

by definition a number belonging to his employer rather than to Mr. Griffin personally.[1]

114. Clarity's file additionally lists 15 different "work phone numbers" for Mr. Griffin, suggesting either rampant data-quality failures or that Clarity has conflated unrelated businesses and individuals into a single consumer file. A consumer with a stable employment history will typically have one work phone line, not 15.

115. Separate and apart from the cross-column inconsistencies described above, Clarity reports more than one distinct number within a single phone category for Mr. Griffin: four different cell phone numbers ("229-XXX-7939", "850-XXX-0504", "850-XXX-0584", and "858-XXX-0504") and three different home phone numbers ("229-XXX-7939", "850-XXX-0504", and "850-XXX-7658").

116. Clarity's own schema treats the cell-, home- and work-phone fields as discrete single lines, and a consumer following a stable telephone history will ordinarily have one number in each.

117. The accumulation of multiple distinct numbers within a single category is a hallmark of a file assembled from unreconciled furnisher data without any

---

[1] In the paragraphs that follow, the middle three digits of each telephone number quoted from Clarity's file have been redacted by counsel to protect Mr. Griffin's privacy and are shown as "XXX." The original disclosure Clarity generated and produced to Mr. Griffin contained the full telephone numbers; Clarity retains a copy of that unredacted disclosure in its own records.

procedure to confirm that each number in fact belongs to Mr. Griffin in the capacity reported. To the extent any such number does not belong to Mr. Griffin – or is not his number in the specific capacity (cell, home, or work) under which Clarity reports it – its inclusion in his consumer report is an inaccuracy that reasonable procedures designed to assure maximum possible accuracy under 15 U.S.C. § 1681e(b) would have prevented.

118. Clarity's consumer disclosure also contains an "Email Information" section, which the agency uses to associate online identifiers with Mr. Griffin's credit file. That section reports an email address ("J…@AOL.COM"; local part redacted by counsel).

119. Online identifiers of this kind function as identity keys: the subprime lenders to whom Clarity sells consumer reports, and Clarity's own record-matching logic, use them to associate a furnished record with a particular consumer. An identifier that does not belong to the consumer is therefore not a harmless cosmetic entry – it is a vector for mismatching Mr. Griffin's file with data that is not his own.

120. To the extent any identifier set out above does not belong to Mr. Griffin, its inclusion in his consumer report is an inaccuracy that reasonable procedures designed to assure maximum possible accuracy under 15 U.S.C. § 1681e(b) would have prevented; and to the extent Clarity ingested and disclosed the identifier with no procedure to verify that it is his own, that failure is itself further evidence of the

unreliable intake the foregoing paragraphs describe.

121. The majority of lenders to whom Clarity sells reports thoroughly examine a consumer's employment history and income data to verify the consumer has a history of reliable employment and stable income.

122. Lenders to whom Clarity sells reports also rely on the identifying information in those reports – such as the consumer's name, date of birth, and address – both to confirm that the report describes the applicant and to assess the risk that an application is fraudulent or that the file has been mismatched to the wrong person. Clarity markets risk scores and fraud-detection products to those lenders.

123. A file carrying inconsistent or facially improbable identifying information tends to present the consumer as a higher fraud or identity risk and impairs the lender's ability to verify the consumer's identity during underwriting.

124. Consequently, Clarity's inclusion of demonstrably false information about Mr. Griffin's address information, driver's license information, employer address, housing status, loan tradelines, months at address, months at employer, net monthly income, pay frequency, and phone-number information had a significant negative impact on Mr. Griffin's ability to obtain new credit with favorable terms.

125. Each of the multiple reports sold by Clarity contained false information about Mr. Griffin's address information, driver's license information, employer

address, housing status, loan tradelines, months at address, months at employer, net monthly income, pay frequency, and phone-number information and more.

126. The FCRA is clear in its requirement that Clarity, as a CRA, is required to prepare accurate reports:

> **Accuracy of Report.** Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates. 15 U.S.C. §1681e(b).

127. Clarity was required to follow reasonable procedures to assure maximum possible accuracy of the information concerning Mr. Griffin.

128. Clarity was thus aware that when it sold reports on Mr. Griffin that, under a best-case scenario, it was selling data and other information it knew it had gathered without regard to accuracy or completeness.

129. Additionally, when Mr. Griffin requested his credit file disclosure from Clarity on July 14, 2026, Clarity provided Mr. Griffin with only a redacted version of his credit file. Clarity redacted all but the last few digits of the driver's license, as well as the account numbers of the credit accounts in the disclosure.

130. Nothing in the FCRA allowed Clarity to redact this information, but it did so anyway.

### Clarity Fails to Meaningfully Disclose Legally Required Information

131. As set forth above, on or about July 14, 2026, Mr. Griffin requested a copy of his consumer credit disclosure from Clarity.

132. Upon receipt of Mr. Griffin's request, Clarity was required to disclose all information "clearly and accurately" in the credit file, including the identity of each person who obtained a consumer report within the prior year. *See* 15 U.S.C. § 1681g(a)(3)(A)(ii).

133. The FCRA defines "Identification" as "the name of the person or, if applicable, the trade name (written in full) under which such person conducts business." *See* 15 U.S.C. § 1681g(a)(3)(B)(i).

134. Frequently, Clarity fails to fulfill its legal obligations regarding disclosure of this data, often disclosing what can be fairly called incomprehensible information which virtually no one would comprehend.

135. For example, Clarity's disclosure shows an inquiry made on May 8, 2026 which Clarity identified to Mr. Griffin only as "Uplift Loans/Tekambi/Financial Technologies Consulting." Even crediting that Mr. Griffin might recognize "Uplift Loans" as a consumer lender, the disclosure still fails its statutory purpose: Mr. Griffin cannot tell from this entry whether "Uplift Loans" actually obtained his consumer report or whether "Tekambi" and "Financial Technologies Consulting" did.

136. "Tekambi" and "Financial Technologies Consulting" are obscure trade names that no reasonable consumer would recognize. The FCRA requires identification of *each* person who obtained a consumer report, *see* 15 U.S.C. §

1681g(a)(3)(A)(ii); partial identification of one bundled name is not compliance.

137. Whether bundled with a recognizable name or composed entirely of opaque abbreviations, none of these disclosures provided Mr. Griffin with the address, phone number, or other contact information that would allow him to identify which entity actually obtained his consumer report or to follow up with that entity directly.

138. Multiple consumers have previously sued Clarity for failing to disclose the names of entities obtaining credit reports as legally required.

139. The failure of a person to provide accurate and truthful information as required by law creates an injury-in-fact, thus creating standing pursuant to Article III. *See, e.g., Havens Realty Corp. v. Coleman,* 455 U.S. 363 (1982) (holding that alleged injury to a plaintiff's statutorily created right to truthful information was a cognizable injury in and of itself, regardless of whether the plaintiff actually intended to use the information for its primary purpose; therefore "the Art. III requirement of injury in fact [was] satisfied.").

140. Further, the lack of accurate, full disclosure of who had obtained his credit report caused Mr. Griffin great frustration and emotional distress and made him concerned he was the victim of fraud or identity theft.

141. Clarity's incomplete disclosure of who accessed Mr. Griffin's credit report and why caused Mr. Griffin significant frustration, stress, and concern.

**Clarity's Lack of Standards Constitute Willful Violations of the FCRA**

142. Clarity operates in stark contrast to its parent company, Experian.

143. While Experian enforces Metro 2 guidelines – industry standards which contain hundreds of pages of explanation on how to report information, covering almost any conceivable scenario, and which is used by other large CRAs and serves as a lingua franca – Clarity requires no such compliance with Metro 2 guidelines and has no discernible quality-assurance standards.

144. In place of an industry-standard data-quality framework, Clarity's operative "standard" is to ingest and republish whatever data its furnishers transmit, without applying even rudimentary validity checks. Clarity's file on Mr. Griffin is the direct product of that approach: it incorporates and sells information that is not merely unverified, but facially impossible – information that no reasonable data-quality procedure could have permitted to enter a consumer report.

145. The inaccuracies in Mr. Griffin's file are not isolated transcription errors traceable to a single furnisher.

146. They span multiple categories of the data Clarity reports – including address information, driver's license information, employer address, housing status, loan tradelines, months at address, months at employer, net monthly income, pay frequency, and phone-number information – and they share a common signature: each is the kind of error that a single, elementary validity check would have caught

before the data was incorporated into Mr. Griffin's file and sold to creditors.

147. Clarity instead operates a system designed to accept and resell that data as if it were genuine.

148. Clarity is not unaware that this is occurring. Clarity has been the subject of repeated FCRA litigation arising from the same categories of inaccuracy described in this complaint – invalid driver's license entries, opaque or bundled inquiry disclosures, contradictory residential and employment histories, and the wholesale incorporation of placeholder or impossible data.

149. Despite this notice, Clarity has continued to operate its systems in materially the same way, without implementing the basic validity checks that would have prevented the errors complained of here.

150. Clarity's decision to forgo the quality controls used by its parent company and by other major consumer reporting agencies, in the face of repeated notice that this decision causes ongoing harm to consumers, constitutes a reckless disregard for the rights of the consumers whose data it sells, including those of Mr. Griffin.

### Damages Suffered by Mr. Griffin

151. As a direct and proximate result of Clarity's inaccurate reporting, Mr. Griffin applied for credit and was either denied outright or offered credit on materially less favorable terms than he would have received had Clarity's file

accurately reflected his true creditworthiness. Lenders and creditors who purchased Clarity's consumer reports made adverse decisions based on the false, impossible, and internally contradictory information described herein.

152. The practical consequences of Clarity's inaccurate reporting are severe. A consumer whose file carries facially improbable or inconsistent identifying information, a conflicting employment history, inconsistent income, and an unstable or inconsistent address history – as Clarity reported about Mr. Griffin – is treated as a higher-risk borrower by the subprime lenders that Clarity primarily serves.

153. This directly results in credit denials, higher interest rates, lower loan amounts, and more restrictive repayment terms, causing Mr. Griffin concrete and measurable financial harm.

154. As a result of the Defendant's actions, Mr. Griffin has suffered damages, including wasted time trying to figure out what the information in his Clarity file means and how it got there, lost financial opportunities, denial of credit, less favorable credit terms, lower credit scores, significant emotional distress and aggravation, and damage to his reputation.

155. As of the date of this filing, Clarity continues to include the aforementioned false information in Mr. Griffin's credit file.

156. Mr. Griffin demands that Clarity conduct an investigation upon service of this lawsuit and correct his file within 30 days.

157.    Mr. Griffin has hired the undersigned law firm to represent him in this matter and has assigned the firm his right to fees and costs.

## COUNT I
## CLARITY'S WILLFUL VIOLATIONS OF THE FCRA, 15 U.S.C. § 1681e(b)

158.    Mr. Griffin adopts and incorporates paragraphs 1 through 157 as if fully stated herein.

159.    Clarity willfully violated 15 U.S.C. § 1681e(b) when it failed to follow reasonable procedures to assure maximum possible accuracy of the consumer reports sold regarding Mr. Griffin, as Clarity sold consumer reports containing erroneous information about his address information, driver's license information, employer address, housing status, loan tradelines, months at address, months at employer, net monthly income, pay frequency, phone-number information, and more.

160.    The duplication of his loan tradeline was apparent from the face of Clarity's own records: both tradelines displayed the same account number ("XXXXXXXXXXX1944"), the same open date (8/12/2019), and the same original amount ($10,000), and Clarity knew the identity of the furnisher that supplied each entry. Clarity nonetheless published both entries, presenting Mr. Griffin as having defaulted on two separate loans when he had, at most, one such account.

161.    Clarity has been sued on numerous occasions for very similar situations and knows that it frequently sells reports with erroneous information about consumers.

162.   Clarity's conduct was thus willful or done with a reckless disregard for Mr. Griffin's rights under the FCRA.

163.   As a result of its conduct, Clarity is liable to Mr. Griffin for the greater of Mr. Griffin's actual damages or statutory damages of up to $1,000 for each occurrence, punitive damages, reasonable attorneys' fees, and costs, per 15 U.S.C. § 1681n.

WHEREFORE, Mr. Griffin respectfully requests this Honorable Court enter judgment against Clarity for:

a.   the greater of Mr. Griffin's actual damages and statutory damages of $1,000 per incident pursuant to 15 U.S.C. § 1681n(a)(1)(A);

b.   punitive damages pursuant to 15 U.S.C. § 1681n(a)(2);

c.   reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3); and

d.   such other relief that this Court deems just and proper.

## COUNT II
## CLARITY'S NEGLIGENT VIOLATIONS OF THE FCRA, 15 U.S.C. § 1681e(b)
### (Pled in the Alternative to Count I)

164.   Mr. Griffin adopts and incorporates paragraphs 1 through 157 as if fully stated herein, and pleads this count strictly in the alternative.

165.   Clarity owed Mr. Griffin a legal duty to utilize reasonable procedures to assure the maximum possible accuracy of its consumer reports regarding Mr.

Griffin.

166.   Clarity violated 15 U.S.C. § 1681e(b) when it sold consumer reports containing erroneous information about Mr. Griffin's address information, driver's license information, employer address, housing status, loan tradelines, months at address, months at employer, net monthly income, pay frequency, phone-number information, and more.

167.   Clarity's breach amounts to a negligent violation of 15 U.S.C. § 1681e(b), and Mr. Griffin is entitled to his actual damages, attorneys' fees, and costs, pursuant to 15 U.S.C. § 1681o.

WHEREFORE, Mr. Griffin respectfully requests this Honorable Court enter judgment against Clarity for:

a.   actual damages pursuant to 15 U.S.C. § 1681o(a)(1);

b.   reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1681o(a)(2); and

c.   such other relief that this Court deems just and proper.

just and proper.

## COUNT III
### CLARITY'S WILLFUL VIOLATIONS OF THE FCRA, 15 U.S.C. § 1681g(a)(3)(A)(ii)

168.   Mr. Griffin adopts and incorporates paragraphs 1 through 157 as if fully stated herein.

169. Clarity violated 15 U.S.C. § 1681g(a)(3)(A)(ii) when it failed to identify each person, including the end-user, that procured Mr. Griffin's consumer report during the one-year period preceding the date upon which he made the request.

170. Clarity is aware that its consumer disclosures fail to properly identify end-users via multiple consumer lawsuits.

171. Clarity's conduct was willful, intentional, and exhibited a reckless disregard for its duties to provide clear and accurate disclosures.

172. As a consequence, Clarity is liable to Mr. Griffin for the greater of Mr. Griffin's actual damages or statutory damages of up to $1,000 for each occurrence, punitive damages, and reasonable attorneys' fees and costs, pursuant to 15 U.S.C. § 1681n.

WHEREFORE, Mr. Griffin respectfully requests this Honorable Court enter judgment against Clarity for:

    a.    the greater of Mr. Griffin's actual damages and statutory damages of $1,000 per incident pursuant to 15 U.S.C. § 1681n(a)(1)(A);

    b.    punitive damages pursuant to 15 U.S.C. § 1681n(a)(2);

    c.    reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3); and

    d.    such other relief that this Court deems just and proper.

## COUNT IV
## CLARITY'S NEGLIGENT VIOLATIONS OF THE FCRA, 15 U.S.C. § 1681g(a)(3)(A)(ii)
### (Pled in the Alternative to Count III)

173.   Mr. Griffin adopts and incorporates paragraphs 1 through 157 as if fully stated herein, and pleads this count strictly in the alternative.

174.   Clarity owed Mr. Griffin a legal duty to disclose the identity of each user that obtained his consumer report within one year of Mr. Griffin's request.

175.   Clarity breached this duty when it failed to identify each person, including end-users, who procured Mr. Griffin's consumer report.

176.   Clarity's breach amounts to a negligent violation of 15 U.S.C. § 1681g(a)(3)(A)(ii), and Mr. Griffin is entitled to his actual damages, attorneys' fees, and costs pursuant to 15 U.S.C. § 1681o.

WHEREFORE, Mr. Griffin respectfully requests this Honorable Court enter judgment against Clarity for:

a.    actual damages pursuant to 15 U.S.C. § 1681o(a)(1);

b.    reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1681o(a)(2); and

c.    such other relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

Page **36** of **37**

Respectfully submitted on July 22, 2026, by:

**SERAPH LEGAL, P. A.**

*/s/ Christian E. Cok*
Christian E. Cok, Esq.
Florida Bar No.: 1032167
CCok@seraphlegal.com
Service@seraphlegal.com
3505 E. Frontage Rd., Suite 145
Tampa, FL 33607
Tel: 813-567-1230
Fax: 855-500-0705
*Attorneys for Plaintiff*